### BOARDMAN et al. v. HITCHCOCK et al.

(Supreme Court, Appellate Division, Fourth Department. January 12, 1910.)

1. WILLS (§ 439*)—CONSTRUCTION—INTENT OF TESTATOR.

Where the intention of testator in the disposition of his property is unmistakable, and the identity of the beneficiary is not uncertain, the court will endeavor to make the gifts effective, unless they clearly infringe some settled principle of construction.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 952–957; Dec. Dig. § 439.*]

2. CORPORATIONS (§ 383*)—POWERS.

Any agency which may reasonably be employed to attain the purpose which impelled the organization of a corporation may be used without transcending the power conferred on it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1542–1544; Dec. Dig. § 383.*]

3. CHARITIES (§ 20*)—CAPACITY OF TRUSTEE—VALIDITY.

A corporation created by Laws 1862, c. 187, for the purpose of establishing and conducting Christian missions among the pagan nations, and the general diffusion of Christianity with power to take and devise property for the purposes of the corporation, may maintain, as incidental to its object, secular schools and colleges in localities where it is

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

endeavoring to spread the Gospel, and an acceptance of money bequeathed to it to be expended for higher education is fairly within its power, and a testamentary gift to it, by one knowing that it had established a college in a foreign country, for the purpose of higher education, is valid.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 18–33; Dec. Dig. § 20.*]

4. CHARITIES (§ 20*)—CAPACITY OF TRUSTEE—VALIDITY.

Such a corporation may maintain a home for the returned needy and worthy missionaries, who under its commission have been carrying on its work in foreign lands, and a testamentary gift to it for the establishment of such a home is valid.

[Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 18–33; Dec. Dig. § 20.*]

Appeal from Special Term, Wayne County.

Action by George L. Boardman and others against Charles F. Hitchcock and another, executors and trustees of Anne E. Mackenzie and another. From a judgment dismissing the complaint on the merits, after trial and decision by the court without a jury, plaintiffs appealed. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Frank C. Sargent, for appellants.

E. W. Hamn, for respondent Board of Foreign Missions.

Myric M. Kelly, for respondent executors.

SPRING, J.   The action is to construe and declare null and void the will of Anne E. Mackenzie, who died a resident of the county of Wayne on the 27th day of November, 1904, leaving, her surviving, no husband, child, lineal descendants, father or mother, but only second cousins, all of whom are parties to this action.   She left considerable property, alleged to amount to $150,000.   The will in controversy was drawn by Presiding Justice Adams, and executed July 14, 1903.   By it she first provided for the payment of her debts and funeral expenses and the erection of a monument.   The second paragraph, in part, is as follows:

"I give, devise and bequeath to the Board of Foreign Missions of the Presbyterian Church in United States of America, my homestead house and lot, whereon I now reside at Sodus Point, aforesaid, consisting of about three acres of land and including thereon a tenant house, to be used by said society as a home for the returned, needy and worthy missionaries thereof; and I hereby authorize, empower and direct said society, from my residuary estate hereinafter bequeathed, to expend and employ for the proper and suitable maintenance of said home, for the purpose herein indicated, an annual sum not to exceed five hundred dollars, or so much thereof as in their judgment may be necessary to so maintain said home."

Out of these premises she directed her executors to set apart a building lot and erect a dwelling house thereon at an expense not exceeding $800 for the benefit of Charles H. Washington, a servant of the testatrix, and said executors are empowered and directed to convey said premises so set apart to said Washington.   The right to use and occupy the tenant house referred to during his lifetime was given to

William Washington, who died before the commencement of this action.

In the third paragraph of the will the testatrix devised to her executors 10 acres of land in Sodus Point, Wayne County, known as "Margaretta Grove," in trust, directing the executors:

"To sell the same when in their judgment it can be sold to the best advantage, and to convert the same into money, the avails thereof to constitute a part and parcel of my residuary estate."

The fourth paragraph is as follows:

"All the rest, residue and remainder of my estate, of every name and description whatsoever, including the avails of the premises known as Margaretta Grove, I give, devise and bequeath unto the aforesaid Board of Foreign Missions of the Presbyterian Church in the United States of America, the same to be employed and used by said society for purposes of higher education, as in the judgment of said board may from time to time seem suitable and proper."

The respondents Hitchcock and Bostwick were named as executors.

It is the contention of the appellants that the Board of Foreign Missions is not authorized to receive any bequest "for the purposes of higher education," as such a purpose is not within the compass of its charter, and that the maintenance of a home "for returned, needy and worthy missionaries" of said society is also incompatible with the scheme of such organization.

The Board of Foreign Missions of the Presbyterian Church was created by special charter under chapter 187 of the Laws of 1862. Section 1, after reciting the names of the incorporators, continues—

"are hereby consituted a body corporate and politic forever, by the name of the Board of Foreign Missions of the Presbyterian Church in the United States of America, for the purpose of establishing and conducting Christian misions among the unevangelized or pagan nations, and the general diffusion of Christianity; and by that name they and their successors and associates shall be capable of taking by purchase, grant, devise or otherwise, disposing of any real or personal estate for the purposes of said corporation."

The act was subsequently amended, but the scope of its power has not been modified.

At the outset in construing the validity of the will, it is important to keep in mind as two fundamental propositions that the intention of the testatrix in the disposition of her property is unmistakable, and that the identity of the donee is not uncertain. With these two basic facts assured, the courts will endeavor to make effective the bequests, unless they clearly countervail some settled principle of construction.

The claim of the appellant involves the proposition that neither the establishment and conducting of "Christian missions among the unevangelized or pagan nations" nor "the general diffusion of Christianity" will be fostered or encouraged by the extension of "higher education." The means by which the pagans are to be evangelized or Christianity diffused are not defined in the charter. They are left to the board to work out as in the judgment of the members may seem best. Among the agencies which have been employed, and effectively, during the whole corporate existence of the board in its laudable efforts to spread the Gospel, has been the founding of schools and col-

leges in foreign countries where the missionaries have been devoting themselves to the evangelization of the heathen. In these schools the curriculum has not been confined to the study and interpretation of the Bible or religious subjects, but has always included secular subjects akin to those taught in the schools of our own state. There has been no line drawn separating higher education from the common elementary branches.

As found by the court, this donee has for many years established—

"and maintained Christian missions, hospitals and schools of all grades, from primary schools to colleges, and professional schools, in Japan, China, India and South America, as well as other pagan lands. It has established and for years maintained more than seventy of said schools, of which, at least, ten are institutions of higher education. The natives attend these schools and colleges and are educated herein."

There has been no abandonment of this method of diffusing Christianity by this Board of Foreign Missions. Its scope has been extended, and it has proved to be an efficacious auxiliary in the development of the main purpose for which the board was organized.

The definition of the power bestowed upon the board in the statute creating it, as we would expect, is expressed in the most simple, direct, and general language. The framers of the national Constitution employed such language in conferring plenary power. Whatever agency may reasonably be employed to attain the great purpose which impelled the organization may be used without danger of transcending the power conferred.

The missionary society has not been able to commission preachers and missionaries sufficient to meet the demands in the foreign fields. Converts in each locality have become missionaries, and under the leadership of those installed by the parent society have been effective in aiding in diffusing Christianity. Their influence with people of their own race and lineage has been a wonderful instrumentality in the spread of the Gospel. Schools were established to educate these converts, all with the purpose of carrying out the objects for which the organization was created. If the converts who have been Christianized acquire advanced education, it is fair to expect that they will be potential in aiding the missionaries representing the respondent society in propagating the principles of Christianity. The defendant society, accordingly, had established schools and colleges in various countries where missions were founded under its tutelage. The purpose of endowing and carrying on these schools and colleges is not primarily to give secular education to the pupils. The fundamental object has been to prevail upon these people to accept Jesus Christ and His teachings. The secular education, whether of an advanced type, or limited to elementary instruction, is incidental to the great principal object, and to fit men better for its accomplishment.

There is nothing in the charter empowering the society to expend money in feeding or supplying with the necessities of life the converts or others in localities where the missionaries are endeavoring to spread the Gospel. If, however, a famine exists, or any other dire necessity arises among these people, the expenditure of money by the defendant to relieve it would be considered incidental to the diffusion of Chris-

tianity or the evangelization of pagans. The feeding of the hungry and the alleviation of the afflicted were practical methods by which the Sainted Master carried on His ministry. In other words, there is a wide range within which the benign purposes of the founders of this society may be accomplished, and there should be no paring down of the authority bestowed, unless a particular act is clearly violative of that authority.

The acceptance of money bequeathed to be expended for higher education is fairly within the purview of the charter creating the Board of Missions. Johnston v. Hughes, 187 N. Y. 446, 452, et seq., 80 N. E. 373; Hanson v. Little Sisters of the Poor, 79 Md. 434, 32 Atl. 1052, 3 L. R. A. 293.

The respondent society had established a college in Brazil with money donated by a brother of the testatrix. She must have known, therefore, that the society was expending money in foreign lands in order to develop higher education among the natives and by that instrumentality to disseminate Christianity. Following the course of her brother, she wished her contribution to the Foreign Mission Board used in securing higher education, evidently believing in that way she could best aid the ulterior purpose of spreading Christianity.

Nor do I think the maintenance of a home "for the returned, needy, and worthy missionaries," who under the commission of the respondent society have been carrying on its work in foreign lands, is beyond the pale of the domain of such society. The life of the foreign missionary is one of privation and self-denial and with little pecuniary compensation. He is far from home and friends and returns infrequently. If the young man considering the advisability of accepting a missionary position with the respondent society knew that when his physical vigor had abated and he became needy he was assured a home in his native country, this fact might be an incentive to him to accept the position.

The society is an extensive one, with an army of courageous men and women devoting their best energies to the spread of the Gospel. To care for the health and comfort of these missionaries is part of the duty of the society which is sponsor for their enlistment and work. To provide a home for those who are worn out in its service is also reasonably within the scope of its charter.

The judgment should be affirmed, with costs.

Judgment affirmed, with separate bills of costs against the appellants and in favor of the respondents appearing by separate attorneys. All concur.